## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IRIS F. MACIAS, LORINE GUMONE and BILLIE MILHAM, individually and on behalf of all others similarly situated, )))))) | CIVIL ACTION NO.: _____ |
| Plaintiffs, ) | |
| v. ) | |
| ) | |
| SISTERS OF CHARITY OF LEAVENWORTH HEALTH SYSTEM, THE BOARD OF DIRECTORS OF THE SISTERS OF CHARITY OF LEAVENWORTH HEALTH SYSTEM, THE DEFINED CONTRIBUTION INVESTMENT COMMITTEE OF THE SISTERS OF CHARITY OF LEAVENWORTH HEALTH SYSTEM and JOHN DOES 1- 30. ))))))))))) | |
| Defendants. ) | |

## CLASS ACTION COMPLAINT

Plaintiffs, Iris F. Macias, Lorine Gumone and Billie Milham, ("Plaintiffs"), by and through their attorneys, on behalf of the SCL Health 401(k) Retirement Savings Plan ("401(k) Plan"), the SCL Defined Contribution Plan ("DC Plan")[1] and the SCL Health Retirement Savings Plan ("403(b) Plan")[2] with all three plans referred to collectively as (the "Plan" where appropriate, or "Plans"),[3] themselves and all others similarly situated, state and allege as follows:

---

[1] The DC Plan merged into the 401(k) Plan on January 5, 2021 with the surviving Plan being the 401(k) Plan. When the 401(k) Plan is referred to it will include both the 401(k) Plan and the DC Plan.

[2] By amendment effective September 30, 2021, SCL terminated the 403(b) Plan with all of its assets to be transferred to the 401(k) Plan by September 30, 2022.

[3] The Plans are legal entities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and its participants.

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Sisters of Charity of Leavenworth Health System ("SCL" or "Company")[4] and the Board of Directors of the Sisters of Charity of Leavenworth Health System and its members during the Class Period ("Board")[5] and the Defined Contribution Investment Committee of the Sisters of Charity of Leavenworth Health System and its members during the Class Period ("Committee").[6]

2.    To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

3.    The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process

---

[4] On April 1, 2022, SCL merged with Intermountain Healthcare. To the extent that SCL should now be referred to as Intermountain Healthcare the terms will be used interchangeably here for periods after April 1, 2022.

[5] As will be discussed in more detail below, the Class Period is defined as June 13, 2017 through the date of judgment ("Class Period").

[6] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants.  *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See*, "*A Look at 401(k) Plan Fees*," *infra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      The Tenth Circuit has also recognized a fiduciary's stringent duties under ERISA:

> A central and fundamental obligation imposed on fiduciaries by ERISA is contained in Part 4, Title 1, § 404(a) [which] … embody a carefully tailored law of trusts, including the familiar requirements of undivided loyalty to beneficiaries, the prudent man rule, the rule requiring diversification of investments and the requirement that fiduciaries comply with the provisions of plan documents to the extent that they are not inconsistent with the Act.

*Eaves v. Penn*, 587 F.2d 453, 457 (10th Cir. 1978); *see also In re Williams Cos. ERISA Litig.*, 271 F. Supp. 2d 1328, 1341(N.D. Okla. 2003) (noting ERISA's fiduciary duties are the highest known to the law.)

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

6.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[7]

---

[7] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

7.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

8.      The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S.Ct. 737, 741 (2022).

9.      At all times during the Class Period, the 401(k) Plan had at least $600 million dollars in assets under management.  At the Plan's fiscal year end in 2021 and 2020, the 401(k) Plan had over $1.8 billion dollars and $870 million dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2020 and December 31, 2021 form 5500 filing of the SCL Health 401(k) Retirement Savings Plan ("2020 and 2021 401(k) 5500").

10.     At all times during the Class Period, the 403(b) Plan had at least $800 million dollars in assets under management. At the Plan's fiscal year end in 2020, the 403(b) Plan had over $844 million dollars in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2020 form 5500 filing of the SCL Health Retirement Savings Plan ("2020 403(b) 5500") at 4. At no time during the Class Period did the Plans collective have less than $1.3 billion dollars in assets. As of 2021 and 2020, the Plans collectively had $1.8 billion and $1.7 billion dollars in assets, respectively. *Id and Op.Cit.*

11.     The Plans' assets under management makes it a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  In 2019, when considering the Plans individually, only 0.01 percent of 401(k) plans in the country had between $500 million and $1 billion in assets under management.[8]  When the Plans are considered collectively, similarly, Plans with over $1 billion in assets made up only 0.01 percent of all plans in the United States. *Id.*  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

12.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plans' investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance.

13.      Defendants' mismanagement of the Plans, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plans and its participants millions of dollars.

14.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

---

[8] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

## IV.   JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

16.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

17.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## V.   PARTIES

### Plaintiffs

18.     Plaintiff, Iris F. Macias ("Macias"), resides in Denver, Colorado. During her employment, Plaintiff Macias participated and invested in all three Plans investing in the options offered by the Plans that are challenged in this lawsuit. Plaintiff Macias specifically invested in the JPMorgan SmartRetirment Series described herein. She suffered injury to her Plan account from the underperformance and excessive expense of these funds. In addition, Plaintiff Macias suffered injury to her Plan account by having to pay for her share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. Further, Plaintiff Macias suffered injury to her Plan account by the fact that her claim against her share of investments in the Plan is diminished by the underperforming

and expensive funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

19.    Plaintiff, Lorine Gumone ("Gumone"), resides in Grand Junction, Colorado. During her employment, Plaintiff Gumone participated and invested in at least two of the Plans investing in the options offered by the Plans challenged in this lawsuit. Plaintiff Gumone specifically invested in the JPMorgan SmartRetirement Series described herein. She suffered injury to her Plan account from the underperformance and excessive expense of these funds. In addition, Plaintiff Gumone suffered injury to her Plan account by having to pay for her share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. Further, Plaintiff Gumone suffered injury to her Plan account by the fact that her claim against her share of investments in the Plan is diminished by the underperforming and expensive funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

20.    Plaintiff, Billie Milham ("Milham"), resides in De Beque, Colorado. During her employment, Plaintiff Milham participated and invested in at least one of the Plans, namely the DC Plan, investing in the options offered by the Plans challenged in this lawsuit. She suffered

injury to her Plan account from the underperformance and excessive expense of these funds. In addition, Plaintiff Milham suffered injury to her Plan account by having to pay for her share of consulting fees to maintain any of the lower performing or expensive funds in the Plan whether specifically identified herein or not, as described below. Further, Plaintiff Milham suffered injury to her Plan account by the fact that her claim against her share of investments in the Plan is diminished by the underperforming and expensive funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees and maintains expensive and/or underperforming funds, as alleged below. *Id*.

21.     Plaintiffs have standing to bring this action on behalf of the Plans because they participated and invested in the Plans and were injured by Defendants' unlawful conduct.  Further, Plaintiffs have standing because their claims against their share of investments in the Plans are diminished by the underperforming funds suffered by the Plan whether they are specifically identified herein or not, as discussed above.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

22.     Plaintiffs did not have knowledge of all material facts (including, among other things, what a competitive expense ratio is for funds in a retirement plan and how target date funds and other funds in a retirement plan should perform as compared to their peers and benchmarks) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

23.     SCL is a named fiduciary of the Plans with a principal place of business being 500 Eldorado Boulevard, Building 4, Suite 4200, Broomfield, Colorado, 80021. 2020 401(k) and 403(b) Form 5500s") at 1. According to its website: "SCL Health is a faith-based, nonprofit healthcare organization dedicated to improving the health of the people and communities we serve, especially those who are poor and vulnerable."[9] SCL's website goes on to say that it was "[f]ounded by the Sisters of Charity of Leavenworth in 1864, our $2.8 billion health network provides comprehensive, coordinated care through eight hospitals, more than 150 physician clinics, and home health, hospice, mental health and safety-net services primarily in Colorado and Montana." *Id.*

24.     SCL appointed the Committee to, among other things, ensure that the investments available to the Plans' participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. The SCL Health Defined Contribution Plan Investment Policy and Guidelines effective date January 28, 2020 ("IPS") at 3-6. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

25.     Accordingly, SCL during the putative Class Period is/was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

26.     For the foregoing reasons, the Company is a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

---

[9] https://www.sclhealth.org/about/ last accessed on March 22, 2023.

9

**Board Defendants**

27.     SCL, acting through its Board, appointed the Committee to, among other things, ensure that the investments available to the Plans' participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. IPS at 3-6. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

28.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

29.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

30.     As discussed above, SCL appointed the Committee to, among other things, ensure that the investments available to the Plans' participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. IPS at 3-6.

31.     The IPS goes on to further define the Committee's role in selecting and monitoring the investment choices available in the Plans as follows: "…performance will be reviewed at least annually in an effort to identify any adverse performance trends or other issues …" IPS at 5. The IPS provides that the funds in the Plans must be evaluated primarily on their 3- and 5-year returns compared to their respective benchmark(s) and the rankings of each fund in the 3- and 5-year peer universe. *Id.* Any underperforming funds should be removed and replaced with their better performing alternatives. IPS at 5.

32.     The Committee and each of its members were fiduciaries of the Plans during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plans' assets.

33.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

34.     To the extent that there are additional officers, employees and/or contractors of SCL Health who are/were fiduciaries of the Plans during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, SCL Health officers, employees and/or contractors who are/were fiduciaries of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## VI.   CLASS ACTION ALLEGATIONS[10]

35.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[11]

---

[10] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants.  *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims).  ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[11] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

> All persons, except Defendants and their immediate family
> members, who were participants in or beneficiaries of the
> Plans, at any time between June 13, 2017 through the date
> of judgment (the "Class Period").

36.     The members of the Class are so numerous that joinder of all members is impractical.  The 2020 Form 5500 lists 8,664 Plan "participants with account balances as of the end of the plan year."  2020 Form 5500 at 2.

37.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plans and have suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated Plaintiffs consistently with other Class members and managed the Plans as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

38.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are/were fiduciaries of the Plans;

B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether the Company and Partnership Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plans were being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

39.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

40.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

41.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII.    THE PLANS

42.     The Plans are a defined contribution plans covering substantially all eligible employees of SCL Health. 2020 Auditor Report for the 401(k) Plan at 5, 2020 Auditor Report for the DC Plan and 2020 at 5 and 2020 Auditor Report for the 403(b) Plan at 5. More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income,

expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. 2020 Auditor Report for the 401(k) Plan at 6, 2020 Auditor Report for the DC Plan and 2020 at 6 and 2020 Auditor Report for the 403(b) Plan at 6. Consequently, retirement benefits provided by the Plans are based solely on the amounts allocated to each individual's account. *Id.*

### Eligibility

43.     In general, the Plans cover all employees of SCL Health from the first day of employment. *Id.*

### Contributions

44.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *Id.*

45.     With regard to employee contributions, participants can elect to make annual pre-tax and Roth contributions subject to Internal Revenue Service ('IRS') limitations. *Id.* With regard to contributions made by the employer, they are based on the number of years of service with the matching contribution being between 2-5%. *Id.*

46.     Like other companies that sponsor 401(k) plans for their employees, SCL Health enjoys both direct and indirect benefits by providing matching contributions to the Plans' participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

47.     SCL Health's employees benefit in other ways from the Plans' matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

48.     Given the size of the Plans, SCL Health likely enjoyed a significant tax and cost savings from offering a match.

*Vesting*

49.     Participants are automatically vested in any contributions they made to their accounts themselves. 2020 Auditor Report for the 401(k) Plan at 7, 2020 Auditor Report for the DC Plan and 2020 at 7 and 2020 Auditor Report for the 403(b) Plan at 6. However, matching contributions made by SCL Health are subject to the terms of the various plans, but, in no case, does the schedule exceed five years. *Id.*

*The Plans' Investments*

50.     In theory, the Committee determines the appropriateness of the Plans' investment offerings and monitors investment performance at least yearly based primarily on the funds 5-year performance histories. The Investment Policy Statement of SCL Health as amended and restated on January 28, 2020 ("IPS") at 5. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

51.     Several funds were available to the Plans' participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

52.     At the Plan's fiscal year end in 2021 and 2020, the 401(k) Plan had over $1.8 billion dollars and $870 million dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. 2021 and 2020 Auditor Report for the 401(k) Plan at 4. At the

Plan's fiscal year end in 2020, the 403(b) Plan had over $844 million dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. 2020 Auditor Report for the 403(b) Plan at 4. At no time during the Class Period did the Plans collective have less than $1.3 billion dollars in assets. As of 2021 and 2020, the Plans collectively had $1.8 billion and $1.7 billion dollars in assets, respectively. *Id and Op.Cit.*

### Payment of the Plans' Expenses

53.     During the Class Period, administrative expenses were paid by using Plan assets. 2020 Auditor Report at 7.

## VIII.   THE PLANS' FEES AND INVESTMENT PERFORMANCE DURING THE CLASS PERIOD WERE UNREASONABLE

### A.   The Totality of the Circumstances Demonstrates that the Plans' Fiduciaries Failed to Administer the Plan in a Prudent Manner

54.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

55.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S.Ct. at 741.

56.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plans, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plans' investments because this information is solely within the possession of Defendants prior to discovery.  *See, Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without

pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

57.    In fact, in an attempt to discover the details of the Plans' mismanagement, Plaintiffs wrote to the Defendants to request, among other things, the Committee's meeting minutes.  This request was made on August 2, 2022. By letter dated October 2, 2022, SCL Health denied the Plaintiffs' request for meeting minutes.

58.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process.  But in most cases, even that is not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

59.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

60.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…"  DOL 408(b)(2) Regulation Fact Sheet.

61.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[12]

62.     Here, Defendants could not have engaged in a prudent process as it relates to evaluating investment management fees and the prudence of the Plans' funds.

**(A)     Defendants Breached Their Fiduciary Duties by Selecting and Retaining in the Plan's Lineup the Chronically Underperforming JPMorgan SmartRetirement Series of Target Date Funds**

**(1.)     The Use of Target Date Funds in 401(k) Plans**

63.     Defendants caused the Plan to include in its menu of investment offerings the materially underperforming JPMorgan target date suite whether it be the JPMorgan SmartRetirement series, available in the I, R5 or R6 share classes, the JPMorgan SmartRetirement Passive blend series and/or the JPMorgan SmartRetirement series offered in a Collective Investment Trust version (hereinafter the entire series will be referred to as the "JPMorgan SmartRetirement Series," when referred to collectively), the performance histories of these funds were mediocre when compared to their appropriate peer groups primarily because the funds had nearly identical managers and ownership.

64.     Target date funds are designed to provide a single diversified investment vehicle for plan participants. Target date funds are offered as a suite of funds, with each fund based on the participant's anticipated retirement date.

65.     The first target date funds in the industry were offered as early as 1994, and since then the market for target date funds has exploded with numerous investment managers offering a variety of different target date fund investments.

---

[12] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

66.     By the mid-2000s, many target date funds with established performance histories were available to defined contribution plans. By 2009, several target date funds had performance histories of five years of more.

67.     Multiple types of assets are included in a target date fund portfolio, including equity (stock) and fixed income (bond) securities. Target date funds offer diversity and balanced exposure to a broad array of underlying securities included in the fund.

68.     An investment in a single target date fund can be attractive to plan participants who do not want to actively manage their retirement savings and periodically convert to more conservative holdings as their retirement date draws near. Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement.

69.     This rebalancing occurs based on the fund's "glide path." A glide path determines how the fund's target asset allocations across the underlying securities are expected to change over time and how they become more conservative as the target retirement date approaches.

70.     The target date refers to the participant's expected retirement year. For example, "target date 2030" funds are designed for individuals who intend to retire in 2030. As the year 2030 approaches, the fund's investment manager adjusts the underlying asset mix to become more conservative.

71.     Target date funds are divided into two broad categories based on the fund's glide path: "To" and "Through" target date funds. A "To" target date fund is designed to allocate its underlying assets to the most conservative investments at the year of the expected retirement. In contrast, a "Through" target date fund continues its glidepath progression to reach its most conservative asset allocation past the expected retirement date. This method focuses on the life expectancy of the participant rather than the retirement date.

72.     The JPMorgan target date Series in the Plans are "Through" funds.

73.     Regardless of the type of target date fund, the development of a target date fund's glide path and the corresponding asset allocations are important components of a target date fund. Constructing and maintaining a proper glide path and prudent asset allocation for target date funds is complex, time-consuming, and requires input from actuaries and other qualified investment professionals.

74.     Another broad classification of target date funds is "actively" or "passively" managed funds. With an actively managed fund, the portfolio manager attempts to select stocks or bonds to generate investment returns that exceed the relevant benchmark index return. With a passively managed fund, the portfolio manager attempts to mimic the performance of a relevant benchmark index. No discretion or research is needed for passive funds, in contrast to actively managed funds. Because of this, passive or index funds charge a much lower investment management fee and have a lower total "expense ratio" relative to active funds.[13]

75.     For all target date funds, diversions from a determined glide path or significant changes in the underlying assets or asset allocations can have an extremely negative impact on wealth aggregation for investors. This impact can be particularly profound for participants in a 401(k) plan. It is well known in the investment industry that 401(k) participants rarely make trades in their 401(k) accounts. A fiduciary, held to the standard of an investment professional, therefore must ensure that an investment option added to a 401(k) plan's suite of investments remains prudent and in the best interest of plan participants.

76.     A fiduciary's duty to ensure that a prudent target date fund is offered to plan participants is heightened when considering the circumstances in which these funds are used by

---

[13] The fees of mutual funds and similar investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points ("bps"). One basis point is equal to 1/100th of one percent.

participants. Given the structure of target date funds, participants often invest all their retirement assets in a single target date fund that matches their retirement date. Some plans, like the Plans, make target date funds the default selection if plan participants do not select a specific fund within the 401(k) plan's lineup of investments. The use of a plan's target date funds as the default investment option underscores the importance of a prudent and diligent process of monitoring target date funds by plan fiduciaries.

77.     A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. This process includes a requirement for the fiduciary to regularly evaluate the fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

78.     With respect to investment returns, diligent investment professionals monitor the performance of their selected target date funds using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

79.     The measurement of target date funds against prudently managed alternatives is critical given that these alternatives represent other target date funds available to the plan, which may be a more appropriate choice to meet participants' retirement needs.

80.     Given the construction and composition of target date funds, diligent investment professionals must perform ongoing analyses and monitoring to ensure that the selected target date funds remains prudent options after their initial selection and insertion into the plan's suite of choices.

81.     During periods of underperformance, diligent investment professionals closely analyze the causes of the underperformance through attribution analyses. Causes or contributing factors are identified and analyzed.

82.     By 2010, multiple investment firms and banks offered target date funds with established and consistent performance histories, stable and experienced management, and discrete changes to the underlying assets and allocations.

83.     Established target date fund investment managers include, but are not limited to, American Funds, T.Rowe Price and Mutual of America. American Funds and T.Rowe have each offered target date funds for nearly 20 years with Mutual of America's offering being closer to 15 years and those target date funds have provided stable investment returns to 401(k) plan participants.

### (2)     The JPMorgan SmartRetirement Series of Target Date Funds Chronically Underperformed

84.     At all relevant times, Defendants maintained the authority to exercise control over the Plans' investments, including the Plan's target date fund investment options.

85.     At all relevant times during the Class Period, the Plan maintained the JPMorgan SmartRetirement  Series of target date funds, whether they were, at certain times during the Class Period, either in the JPMorgan SmartRetirement series, available primarily in the I, R5 or R6 share classes, the JPMorgan SmartRetirement Passive blend series and/or the JPMorgan SmartRetirement series in its Collective Investment Trust ("CIT") version.

86.     In 2020, the 401(k) Plan held approximately $500,000 in the JPMorgan SmartRetirement Series. 2020 401(k) Plan Auditor Report at 15. With such a large amount invested in the target date series, the Plan would have been able to choose virtually any available target date series for the Plans.

87.     The JPMorgan Target Date Series are the only target date investing options in the Plans. In other words, participants in the Plans who want to invest in a target date strategy have no choice other than the JPMorgan Target Date Series.

88.     Defendants were under an obligation under ERISA to carefully vet the JPMorgan Target Date Series before selecting them for inclusion in the Plans. Defendants were also under a continuing obligation under ERISA to carefully monitor and scrutinize the performance of the JPMorgan Target Date Series on an ongoing basis thereafter.

      (a)      **The JPMorgan Target Date Series Materially Underperformed Relative to Comparator Target Date Funds and Indexes**

89.     The JPMorgan Target Date Series consistently materially underperformed industry-accepted benchmarks for target date funds used by investment professionals.

90.     The JPMorgan Target Date Series can be compared to various similar target date funds ("Comparator Funds") and relevant indexes ("Comparator Indexes") as benchmarks. Suitable Comparator funds include the T.Rowe Price Retirement I target date suite, the American Funds target date suite and the Mutual of America target date suite. These three target date suites are suitable Comparator Funds to the JPMorgan Target Date Series because Morningstar, the most well respected and accepted financial industry fund database places all three funds in the Morningstar Lifetime Moderate Index category.

91.     A Morningstar Category is assigned by placing funds [*e.g*., T.Rowe Price Retirement I target date funds and the American Funds target date suite etc.] into peer groups based on their underlying holdings. The underlying securities in each portfolio are the primary factor in [Morningstar's] analysis . . . .  Funds are placed in a category based on their portfolio statistics and compositions over the past three years. Analysis of performance and other indicative facts are also considered." *See* Morningstar's summary of the Northern Trust Focus 2045 Fund, filed in *Allegretti v. Walgreen Co. et al*., No. 19-cv-05392 at Dkt. 43 ECF pg. 28 (N.D. Ill. Dec. 6, 2019). The analysis in *Allegretti* similarly deals with the Morningstar Lifetime Moderate Index category. *Id.*

92.     Further, as Morningstar itself states that it created its categories "to help investors make meaningful comparisons between mutual funds. Morningstar found that the investment objective listed on a fund's prospectus often did not adequately explain how the fund was actually invested." Morningstar Category Classification, 31 March 2022 ("Morningstar Classifier")[14] at page 5. The Morningstar Classifier goes on to state that "[f]or example, many funds claimed to be seeking "growth," but some of those were investing in established blue-chip companies while others were investing in small-cap companies." *Id.*

93.     Another valuable Comparator Index is the S&P Target Date Index. The S&P Target Date Index is a prominent and widely-accepted target date benchmark for "Through" target date funds. It provides exposure to equities, bonds, and other asset classes.[15] The S&P Target Date Index is used as the primary benchmark for many target date funds throughout the industry. At least one large holder of target date funds in the Lifetime Moderate Index category uses the S&P Target Date Index as the benchmark index held in its 401(k) plan.[16]

94.     A prudent fiduciary should have used some or all of these benchmarks, or substantially similar benchmarks, to evaluate the performance of the JPMorgan Target Date Series as early as the inception of the Class Period, or sooner, and on an ongoing basis thereafter.

---

[14] Available at the following web address:
https://advisor.morningstar.com/Enterprise/VTC/MorningstarCategoryClassificationforFunds_April2022.pdf. Last accessed on May 12, 2023.
[15] *See, e.g.,* https://www.spglobal.com/spdji/en/indices/multi-asset/sp-target-date-2035-index/#overview (Factsheet for S&P Target Date 2035 Index) (last visited October 27, 2022).
[16] *See* Complaint in *Allegretti v. Walgreen Co. et al.*, No. 19-cv-05392 at Dkt. 1 ¶ 46 (N.D. Ill. Aug. 9, 2019) ("According to Plan documents, the [Walgreen 401(k)] Plan uses the S&P Target Date Index as the investment benchmark for each of the Northern Trust [Focus] Funds." The Northern Trust [Focus] Funds are relevant here because Morningstar places them in the same category, namely, the Lifetime Moderate Index category.

95.     The performance of the JPMorgan Target Date Series lagged behind the performance of the applicable Comparator Funds for many years before the inception of the Class Period clearly showing that it was an imprudent choice for the Plan.

96.     The three and five year averages as early as 2014, prior to the Class Period, shows that the JPMorgan series of target date funds have been historically an imprudent selection. Using target date 2040 as a sample year[17], it's clear that out of more than 200 Morningstar peer funds in the LT Mod target date group, the JPMorgan series was mediocre at best from 2014 to present. Here, three target date series from this Morningstar peer group will be analyzed, namely T.Rowe Price Retirement 2040 (TRRDX), Mutual of America 2040 (MURLX) and the American Funds 2040 Target Retirement R6 (RFGTX). As of the start of the Class Period, the three and five year average returns were consistently superior to any of the JPMorgan series of target date funds used by the Plan during the Class Period. The chart below analyzes these funds against the JPMorgan SmartRetirement Series as of December 31, 2014.

| Analysis as of 12/31/2014 | 3 Yr | 5 Yr |
|---|---|---|
| **Fund in Plans** | | |
| JPM SR 2040 R5 (SMTIX 5/15/06) | 16.21% | 11.80% |
| | | |
| **Superior Performing Comparator Funds** | | |
| Trowe Ret 2040 (TRRDX 9/30/02) | 16.25% | 12.06% |
| Mutual of America 2040 (MURLX 11/5/07) | 16.23% | 12.92% |
| Am 2040 Trgt Ret R6 (RFGTX) | 16.48% | 11.79% |
| Bench/Index: Morn LT Mod 2040 | 14.52% | 11.24% |

97.     Clearly, analyzing data that would have been available to the Plan at the start of the Class Period, the JPMorgan SmartRetirment Series was an imprudent selection. As of 2014, there were known superior performing alternatives which should have been selected. These alternatives

---

[17] A complete analysis for each target date year beginning in 2025 to 2060 is attached hereto as Appendix "A."

are in the same style as the JPMorgan Series, namely in the Morningstar Life Time Moderate category. These three funds are just a few out of possibly a hundred or more funds in this category which would have been superior to any of the JPMorgan Series of target date funds. Similar results are seen for every target year for each of the three series analyzed above.

98.     This trend continued into 2015 and 2016 as demonstrated in the charts below.

| Analysis as of 12/31/2015 | 3 Yr | 5 Yr |
|---|---|---|
| **Fund in Plans** | | |
| JPM SR 2040 R5 (SMTIX 5/15/06) | 9.29% | 8.01% |
| | | |
| **Superior Performing Comparator Funds** | | |
| Trowe Ret 2040 (TRRDX 9/30/02) | 10.23% | 8.72% |
| Mutual of America 2040 (MURLX 11/5/07) | 10.83% | 9.03% |
| Am 2040 Trgt Ret R6 (RFGTX) | 10.87% | 9.21% |
| Bench/Index: Morn LT Mod 2040 | 7.67% | 7.07% |

| Analysis as of 12/31/2016 | 3 Yr | 5 Yr |
|---|---|---|
| **Fund in Plans** | | |
| JPM SR 2040 R5 (SMTIX 5/15/06) | 4.25% | 10.51% |
| | | |
| **Superior Performing Comparator Funds** | | |
| Trowe Ret 2040 (TRRDX 9/30/02) | 4.61% | 11.11% |
| Mutual of America 2040 (MURLX 11/5/07) | 6.11% | 11.73% |
| Am 2040 Trgt Ret R6 (RFGTX) | 5.18% | 11.45% |
| Bench/Index: Morn LT Mod 2040 | 4.28% | 9.63% |

99.     Again, there's no reason why the Plan's fiduciaries would have chosen the JPMorgan SmartRetirment Series over the many superior performing alternatives. Had the fiduciaries to the Plan been putting the interests of plan participants first, the JPMorgan SmartRetirment Series would not have been selected for the Plan. In 2017, the Plan continued in the R5 version of the JPMorgan SmartRetirement funds with a later change to the JPMorgan SmartRetirment Blend but the poor results, predictably, continued into 2017 and 2018 as demonstrated in the charts below.

| Analysis as of 12/31/2017 | 3 Yr | 5 Yr |
|---|---|---|
| **Fund in Plans** | | |
| JPM SR 2040 R5 (SMTIX 5/15/06) | 8.56% | 11.17% |
| | | |
| **Superior Alternatives** | | |
| Trowe Ret 2040 (TRRDX 9/30/02) | 9.56% | 11.95% |
| Mutual of America 2040 (MURLX 11/5/07) | 9.19% | 12.27% |
| Am 2040 Trgt Ret R6 (RFGTX) | 9.88% | 12.44% |
| Bench/Index: Morn LT Mod 2040 | 8.80% | 10.83% |

| Analysis as of 12/31/2018 | 3 Yr | 5 Yr |
|---|---|---|
| **Fund in Plans** | | |
| JPMorgan SR Blend  2040 R5 (JOBBX) | 6.29% | 4.87% |
| | | |
| **Superior Alternatives** | | |
| Trowe Ret 2040 (TRRDX 9/30/02) | 6.77% | 5.30% |
| Mutual of America 2040 (MURLX 11/5/07) | 6.45% | 5.24% |
| Am 2040 Trgt Ret R6 (RFGTX) | 7.62% | 6.04% |
| Bench/Index: Morn LT Mod 2040 | 6.97% | 4.65% |

100.    Because the JPMorgan SmartRetirment Series had nearly identical managers, it's not surprising that the change to the SmartRetirement Blend in 2018 failed to yield better results. Based on the troubled history of the entire JPMorgan SmartRetirment Series, it should not have been selected for inclusion in the Plans, but, instead, one of the better performing funds listed above should have been chosen.

101.    From 2019 to the present, the Plan continued to offer the JPMorgan SmartRetirment Series. Beginning in 2020, the Plan did make a minor modification to the series by changing it to the JPMorgan CIT target date passive blend series. However, again predictably, the passive blend series faired just as poorly as the rest of the Series included in the Plan from the start of the Class Period. This change had no material effect on fund performance and the funds continued to languish as demonstrated by their one-year performance histories in the chart, below:

| Year | | 2022 | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|
| **Fund in Plan[18]** | | | | | |
| JPMCB SR Pass Bl 2040 CF-D | | -16.79% | | | |
| JPMCB SR Pass Bl 2040 CF-C | | | 15.99% | 12.88% | |
| JPMCB SR Pass Bl 2040 CF-B | | | | 12.93% | |
| JPMorgan SR Blend  2040 R5 (JOBBX) | | | | | 23.72% |
| | | | | | |
| **Superior Alternatives** | | | | | |
| Trowe Ret I  2040 I (TRPDX) | | -18.72% | 16.58% | 18.16% | 24.89% |
| Am 2040 Trgt Ret R6 (RFGTX) | | -17.55% | 16.83% | 18.77% | 24.40% |
| Mutual of America 2040 (MURLX) | | -15.37% | 19.89% | 13.43% | 24.25% |
| Cat: TD 2040 | | -17.32% | 15.47% | 14.56% | 23.19% |
| Bench/Index: Morn LT Mod 2040 | | -17.37% | 15.35% | 13.09% | 24.35% |
| S&P Tgt 2040 | | | -15.56% | 16.55% | 13.37% | 23.37% |

102.    As demonstrated above, the JPMorgan CIT passive blend series lagged behind its peers in terms of performance from 2020 to 2021. Although, these funds did slightly better than their peers in 2022, 2022 was an outlier year and early returns from 2023 suggest that we will see the funds continue to struggle as compared to their peers.

103.    SCL Health's own investment policy statement required that this target date be replaced based on its poor performance as early as the start of the Class Period, if not sooner. *See,* IPS at 5. As detailed in the IPS: "…performance will be reviewed at least annually in an effort to identify any adverse performance trends or other issues …" *Id.* Further, the IPS provides that the funds in the Plans must be evaluated primarily on their 3- and 5-year returns compared to their respective benchmark(s) and the rankings of each fund in the 3- and 5-year peer universe. *Id.* Any underperforming funds should be removed and replaced with their better performing alternatives. IPS at 5.

---

[18] It's not clear from the public filings which share class of the JPMorgan SmartRetirement Blend CITs were in the Plans. Accordingly, various share classes are shown here to demonstrate there were not material differences between the CIT share classes in terms of performance and to further demonstrate that the entire Series performed similarly and should have been replaced no matter which version of the Series was chosen.

104.     Had SCL Health followed its own IPS and removed the JPMorgan target date Series, the Series would not have continued in the Plans until the present.

105.     Given the long history of underperformance of the entire JPMorgan SmartRetirement Series, whether in the I, R5 or R6 shares, the R5 blend series or the CIT passive blend, whether in the CF-D, CF-C or CF-B shares, it's clear that any of these funds were an imprudent choice and should have been replaced at the start of the Class Period.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

106.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

107.     At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

108.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plans for the sole and exclusive benefit of the Plans' participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

109.     The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint such as failing to select prudent investment options or failing to replace investment options when they became imprudent.

110.    The failure to engage in an appropriate and prudent process resulted in saddling the Plans and its participants with imprudent investment options that cost the Plans' participants potential retirement benefits.

111.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans suffered millions of dollars of losses due to investment return damages. Had Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

112.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plans all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

113.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
#### (Asserted against SCL Health and the Board Defendants)

114.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

115.    SCL Health and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the

Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plans.

116.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plans in the event that the Committee Defendants were not fulfilling those duties.

117.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plans' investments; and reported regularly to the Monitoring Defendants.

118.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plans suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)    failing to monitor the processes by which the Plans' investments were evaluated; and

(c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent and poorly performing investments within the Plans all to the detriment of the Plan and Plan participants' retirement savings.

119.    As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

120.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plans all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiff's counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plans all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans and removal of the Plans' fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: June 13, 2023                    **CAPOZZI ADLER, P.C.**

                                        */s/ Donald R. Reavey*
                                        Donald R. Reavey, Esquire
                                        PA Attorney ID #82498
                                        (*Admitted in the Federal District of Colorado*)
                                        2933 North Front Street
                                        Harrisburg, PA 17110
                                        Email: donr@capozziadler.com

Telephone:  (717) 233-4101
Fax: (717) 233-4103

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
(*Admitted in the Federal District of Colorado*)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
Telephone:  (610) 890-0200
Fax: (717) 233-4103

Counsel for Plaintiffs and the Putative Class

Addresses of Plaintiffs as Required by Local Procedure:

Iris F. Macias                                Lorine Gumone
E. 48th Avenue, Unit 11202                     1140 23rd
Denver, CO  80238                              Grand Junction, CO  81505

Billie Milham
4435 Horse Canyon Road
De Beque, CO  81630